**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

| | | |
|---|---|---|
| CHEYENNE COLSON, | : | |
| Plaintiff, | : | |
| v. | : | CASE NO.: 7:23-CV-00081 (WLS) |
| LASALLE SOUTHEAST, LLC, *et al.*, | : | |
| Defendants. | : | |

## ORDER

Before the Court is Defendants LaSalle Southeast, LLC and Michael Williams's Motion for Summary Judgment (Doc. 46). After review, the Motion is granted, in part, and denied, in part.

## I. PROCEDURAL BACKGROUND

Plaintiff Cheyenne Colson commenced this action in the Superior Court of Irwin County, Georgia, on October 3, 2022. (Doc. 1-2). Defendants LaSalle Southeast, LLC ("LaSalle") and Michael Williams ("Williams") removed the case to this Court on July 14, 2023. (Doc. 1). Plaintiff filed an Amended Complaint (Doc. 20) on April 2, 2024, which is the operative complaint. Plaintiff asserts three federal claims against LaSalle for violations of Title VII, including hostile work environment harassment at Count I, discrimination based on sex at Count II, and retaliation at Count III. (Doc. 20 ¶¶ 53–99). Plaintiff asserts two state law claims against Defendant Williams for assault at Count IV, and intentional infliction of emotional distress at Count V, (*id.* ¶¶ 100–12), and one state law claim against LaSalle for negligent retention and supervision at Count VI. (*Id.* ¶¶ 113–19). She also brings a claim for punitive damages against both Defendants at Count VII. (*Id.* ¶¶ 120–22).

Defendants filed the instant Motion for Summary Judgment (Doc. 46) on October 8, 2025. Plaintiff filed her Response (Doc. 53) on November 7, 2025, and Defendants replied (Doc. 54) on November 21, 2025. In her response, Plaintiff waives her Title VII discrimination claim against LaSalle and her intentional infliction of emotional distress claim against Williams.

(Doc. 53 at 9). Accordingly, Defendants' Motion is **GRANTED** as to Plaintiff's claims in Counts II and V. The Court proceeds to Defendants' Motion as to the remaining claims.

## II. STANDARD OF REVIEW

Under Fed. R. Civ. P. 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). [1]

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "'A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.'" *Grimes v. Miami Dade Cnty.*, 552 F. App'x 902, 904 (11th Cir. 2014) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000)). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "It is 'genuine' if the

---

[1] Local Rule 56 requires the movant for summary judgment to attach to the motion a separate statement of the material facts about which the movant contends there is no genuine dispute. M.D. Ga. L.R. 56. The respondent shall attach to its response a separate statement of material facts to which respondent claims there exists a genuine dispute. *Id.* The respondent shall also respond to each of the movant's numbered material facts. *Id.* Here, both Parties have complied fully with Local Rule 56.

record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of showing, by citing to the record, that there is no genuine issue of material fact. *See Celotex*, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by demonstrating that the nonmoving party has failed to present evidence in support of an element of its case on which it bears the ultimate burden of proof. *See Celotex*, 477 U.S. at 322–24. Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings and by [the nonmovant's] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quotation marks omitted). To avoid summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.

On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict. *See Matsushita*, 475 U.S. at 587–88; *Allen,* 121 F.3d at 646. Yet the Court must grant summary judgment if there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## III. <u>RELEVANT FACTUAL BACKGROUND</u>

Plaintiff Cheyenne Colson was a former correctional officer at the Irwin County Detention Center (ICDC), which was operated by LaSalle under the supervision of the Irwin County Sheriff's Department. (Doc. 46-1 ¶ 1, 19).[2] While working at ICDC, Plaintiff claims she was sexually harassed by Defendant Williams. (*See id.* ¶¶ 22–34). Plaintiff alleges LaSalle terminated her in retaliation for complaining of this harassment.

[2] If a fact is undisputed by Plaintiff, the Court relies on Defendants' Statement of Undisputed Material Facts (Doc. 46-1) for relevant propositions. If Plaintiff disputes a fact, the Court relies on Plaintiff's Response to Defendants' Statement of Facts (Doc. 53-1). To fill in some details, the Court also relies on Plaintiff's Statement of Material Facts (Doc. 53-2).

### A. Plaintiff's Employment with ICDC

Plaintiff began her employment at ICDC on July 26, 2021. (Doc. 46-1 ¶ 19). During this time, ICDC operated four twelve-hour rotating shifts, labelled as A, B, C, and D, two of which were day shifts and two were night shifts. (*Id.* ¶ 4). Plaintiff was assigned to the D night shift with Williams as her supervisor. (Doc. 53-2 ¶¶ 3–4). Four other employees were assigned to D shift with Plaintiff, including two female officers relevant here: Brockington and Rowell. (*Id.* ¶ 3).

On August 22, 2021, Plaintiff submitted a written complaint to human resources claiming that Williams had engaged in inappropriate conduct between August 15, 2021, and August 20, 2021. (Doc. 46-1 ¶ 22); (Doc. 53-1 ¶ 22). The conduct consisted of the following:

1. On August 15, 2021, Williams messaged Plaintiff on Facebook asking, "What's up?" Plaintiff responded, "What's up!" Williams then replied, "Laying here watching TV." (Doc. 46-1 ¶ 23).
2. On August 16, 2021, while passing Plaintiff in the hallway, Williams grabbed her arm and commented on Plaintiff's new haircut, telling her she looked "cute, very cute." (Doc. 53-1 ¶ 24).
3. On August 17, 2021, Williams took a photograph of Plaintiff on his phone while she was working in the Alpha dormitory and showed it to another female officer remarking, "Look how bored she looks on Alpha." (Doc. 46-1 ¶ 28). The photograph was taken as Plaintiff was in the process of turning around and captured both her face and her back. (Doc. 49 at 53:21–23).
4. At the end of Plaintiff's shift that same day, Williams passed Plaintiff and Brockington from behind, and the antenna of his radio grazed the back of both of their necks. (Doc. 46-1 ¶ 29).
5. On August 19, 2021, Williams sent Plaintiff a Facebook message saying, "Morning[.]" (*Id.* ¶ 30). Later that day, Williams sent another message saying, "Hello[.]" (*Id.* ¶ 34).
6. On August 20, 2021, after Plaintiff accidentally switched off a light, Williams remarked to Plaintiff that the light was switched off because of "that big ass you have." This remark was made in the presence of two other female officers. (*Id.* ¶ 31).
7. Later that day, Williams remarked to Plaintiff that he knew what time she had awoken because he saw when she first accessed her Facebook account. (*Id.* ¶ 32).

8. Also on August 20, 2021, Plaintiff was engaged in conversation with another female officer regarding wearing a nicotine patch to work when Williams interjected stating, "Oh, don't make me do a full body search, Colson." (*Id.* ¶ 33); (Doc. 53-2 ¶ 28).

After filing her complaint on August 22, 2021, Plaintiff was moved from D shift to B night shift. (Doc. 46-1 ¶ 38). Williams was instructed to stay away from Plaintiff. (*Id.* ¶ 39); (*see also* Doc. 53-1 ¶ 39). An investigation into Plaintiff's complaint commenced on September 1, 2021. (Doc. 53-2 ¶ 45). An investigator from the Irwin County Sheriff's Office took Plaintiff's statement and interviewed Brockington, Rowell, and another female officer who witnessed the above events. (*Id.* ¶¶ 46, 64). On September 2, 2021, Plaintiff submitted another written statement complaining that on August 27 and 28, she saw Williams from a distance in a vehicle in the parking lot as she was entering the facility. (Doc. 46-1 ¶ 41). Plaintiff had two other encounters with Williams after August 28. On October 14, 2021, Williams answered a facility-wide radio call for assistance which Plaintiff made when she felt threatened by inmates during a pill call. (*Id.* ¶¶ 45–46). And on November 2, 2021, Williams answered another radio call Plaintiff made to a different lieutenant. (*Id.* ¶ 49). Plaintiff did not physically see Williams during either of these encounters, but her supervisor allowed her to leave early after Plaintiff expressed that she was upset by Williams's presence at the facility. (*Id.* ¶¶ 47, 49). Plaintiff submitted statements to ICDC regarding Williams's presence during her October 14 and November 2 shifts. (*See* Docs. 49-7 & 49-9).

On October 15, 2021, Plaintiff met with then-Warden Robert Paulk ("Warden Paulk") and the deputy warden to make a complaint about Williams answering her radio call during the pill call incident the day prior. (Doc. 46-1 ¶ 48). During the meeting, Plaintiff was told that she was under investigation for reasons that were not revealed to her. (Doc. 53-2 ¶ 66); (Doc. 49 at 147:24–25, 148:1–4). The investigation was allegedly based on three submissions from other staff members, although it is unclear whether the submissions were considered mere statements or actual write-ups. (*Id.* ¶ 65); (Doc. 49 at 146:8–17). Aside from these submissions and Warden Paulk's statement that she was under investigation, Plaintiff never received any formal write-ups, warnings, demotions, or other disciplinary action during her employment at ICDC. (Doc. 46-1 ¶ 21).

On October 28, 2021, the investigation of Plaintiff's complaint concluded with no further action "due to the lack of evidence in this case that Lieutenant Williams has done anything to approach the threshold of an illegal act regarding Officer Colson[.]" (Doc. 46-1 ¶ 71). The investigative file was then submitted to LaSalle's human resources and the deputy warden for a determination of whether any policy violations had occurred, and if so, whether further action was necessary. (*Id.* ¶ 72). Ultimately, no disciplinary action was taken against Williams. (*Id.* ¶ 73).

**B. Overtime Hours**

Following Plaintiff's transfer to B shift, her job duties, pay, position, and hours remained the same, but Plaintiff was told she would no longer be allowed to work overtime to avoid any overlap with Williams's shift. (Doc. 46-1 ¶¶ 40, 50); (Doc. 49 at 75:8–16). Plaintiff disputes LaSalle's proffered reason why she was unable to work overtime. She argues that because of the shift rotation, wherein there were twelve hours between each night shift, she could have worked her normal B shift and up to twelve hours of overtime before encountering Williams when he arrived for D shift later that night. (Doc. 53-1 ¶ 50). Plaintiff also points to other overtime positions she could have been assigned to, including external positions guarding the facility's perimeter and conducting hospital transports, as well as internal positions like "F Rover," "Central Control," "Utility," and "Front Desk." (Doc. 53-2 ¶ 75).

Warden Paulk testified that, given the needs of the facility in mid-to-late 2021, the majority of overtime shifts during that time were for hospital transport and perimeter. (Doc. 51 at 45:17–23). He further testified that Plaintiff was not qualified to work either of those positions because they required certifications Plaintiff did not have, and additionally, ICDC preferred that officers have a minimum of three to six months of employment experience before being assigned those duties. (*Id.* at 157:8–22, 47:11–20). For instance, perimeter duty required an employee to either be certified to carry a weapon or have special clearance and authorization to drive company vehicles, and officers were ineligible to obtain such authorization until they had been employed for ninety days. (*Id.*) Likewise, hospital transport duty required weapons certification. (Doc. 46-1 ¶ 53).

Plaintiff does not dispute that she had neither a weapons certification nor driver clearance and therefore lacked the required certifications for perimeter and transport duties.

(Doc. 53-2 ¶ 72). Rather, Plaintiff points to the internal positions, "F Rover," "Central Control," "Utility," and "Front Desk," which did not require any certifications, to argue that she could have worked overtime after she made the complaint against Williams. (*Id.* ¶ 75). Plaintiff's argument is based on the fact that she and other officers were assigned those overtime positions in August of 2021. (*Id.* ¶ 75); (Doc. 53-3 ¶ 3). Plaintiff does not present any evidence that other officers worked overtime in any of these positions after August 28, 2021. (Doc. 53-2 ¶ 74); (*see generally*, Doc. 53-3).

After Plaintiff's sexual harassment complaint, Williams was allowed to continue working overtime shifts, including on August 27 and 28, October 14, and November 2, 2021, although he was mostly restricted to overtime assignments that put him outside the facility's buildings. (Doc. 46-1 ¶ 52); (Doc. 53-1 ¶ 51). For instance, on August 27 and 28, Williams was called in to work overtime covering the perimeter of the facility during Plaintiff's shift. (Doc. 50 at 128:10–13).

**C. Past Complaints Against Williams**

Defendant Williams was employed at ICDC for over seventeen years. (Doc. 46-1 ¶ 9). In April of 2021, Officer Rowell filed a complaint against Williams after Williams told her that her rear end looked like a "moon pie," which was her nickname. (*Id.* ¶ 11). She also claimed he once put his hand on her knee and said, "You know I have to mess with you." (*Id.*) During the inquiry into Plaintiff's complaint, Officer Brockington submitted a statement and sat for an interview where she described the following incidents involving Williams. (Doc. 51-19 at 2).

1. Williams sent Brockington a message stating that she "better behave" when conducting a hospital transport with him. (*Id.*)
2. Brockington was told about a comment Williams made to Plaintiff and another officer that he had not "hit" Brockington yet, a phrase which she understood to be a reference to sexual contact. (*Id.*) Brockington also overheard Williams make a similar statement to another officer in reference to Plaintiff. (*Id.* at 7).
3. Williams sent a Facebook "friend" request to Brockington, which she denied. (*Id.*)
4. Williams once attempted to hug Brockington, but she declined and moved away from him. (*Id.*)
5. Williams told Brockington that if a fight broke out among inmates, she could show her chest to stop the altercation. (*Id.*)

Williams was ultimately terminated on March 2, 2023, for misconduct unrelated to sexual harassment. (Doc. 46-1 ¶ 16).

### D. Plaintiff's Separation from LaSalle

In August of 2021, Immigration and Customs Enforcement ("ICE") terminated a contract with LaSalle to house immigration detainees, which resulted in a significant reduction in the number of inmates housed at ICDC. (Doc. 46-1 ¶ 6). As a result, LaSalle issued a WARN notice to ICDC staff, including Plaintiff, on August 31, 2021, informing them of mass layoffs set to begin at the end of October. (*Id.* ¶ 7). The layoffs were determined based primarily on seniority, and many employees voluntarily resigned between September and October. (*Id.* ¶ 8).

On October 27, 2021, Plaintiff was advised that she would not be laid off due to the ongoing investigation of her complaint. (Doc. 46-1 ¶ 55). Plaintiff, however, submitted a written two-week notice of resignation that same day because she believed her safety would continue to be put at risk, both from inmates and Williams, and that she would continue to be retaliated against by not being allowed to work overtime hours. (Doc. 53-2 ¶ 68); (Doc. 46-1 ¶ 59). Plaintiff's last day of employment was November 10, 2021. (Doc. 46-1 ¶ 56).

## IV. <u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

Defendants move for summary judgment on each of Plaintiff's claims. The Court first addresses Plaintiff's Title VII claims before turning to the state law claims.

### A. Hostile Work Environment Claim

LaSalle moves for summary judgment on Plaintiff's hostile work environment claim in Count I, arguing that Plaintiff cannot establish a prima facie case of gender-based hostile work environment sexual harassment. (Doc. 46-2 at 8). Alternatively, LaSalle argues that even if Plaintiff could make out a prima facie claim, her claim would be barred by the *Faragher-Ellerth* affirmative defense. (*Id.*)

"A hostile work environment claim under Title VII is established upon proof that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Galloway v. Ga. Tech. Auth.*, 182 F. App'x 877, 882 (11th Cir. 2006). The environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."

*Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). "Sexual harassment that takes the form of a hostile work environment is actionable under Title VII." *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1304 (11th Cir. 2016) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986)).

To establish a prima facie case for a hostile work environment based on sexual harassment, Plaintiff must establish the following: "(1) she belongs to a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of the employment; and (5) there is a basis for holding the employer liable for the harassment." *Id.* at 1304–05 (citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)). For clarification, the *McDonnell Douglas* framework is not expressly applicable to hostile work environment claims in the Eleventh Circuit. "Technically, the standards applicable to . . . employment-discrimination and hostile-work-environment claims are different." *Harris v. Pub. Health Tr. of Miami-Dade Cnty.*, 82 F.4th 1296, 1304 n.5 (11th Cir. 2023). "For whatever reason, [the Eleventh Circuit has not] applied the three traditional frameworks—direct evidence, *McDonnell Douglas*, and 'convincing mosaic'—to hostile-work-environment claims." *Id.* This means that there is no burden-shifting or pretext requirement. To survive summary judgment, Plaintiff must demonstrate that a reasonable jury—viewing facts and inferences in the light most favorable to her—could find that each of the required elements are met.

Defendants do not dispute the first element, that Plaintiff belongs to a protected group. (Doc. 46-2 at 8). While it is questionable whether some of the conduct Plaintiff complains of can be considered of a sexual nature, the Court assumes, without deciding, that the second and third elements are met. Even so, Plaintiff's claim fails on the fourth element because the harassment was not sufficiently severe or pervasive and did not alter the terms or conditions of her employment.

For conduct to be severe or pervasive, Plaintiff must show that "(1) she subjectively perceived the harassment as severe, and (2) that this subjective perception was objectively reasonable." *Brown v. Green Cnty., Ga.*, No. 3:05-CV-89, 2007 WL 945144, at *6 (M.D. Ga. Mar. 27, 2007) (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999)). There is no doubt Plaintiff subjectively perceived Williams's conduct as harassing. "[T]he objective

severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Mendoza*, 195 F.3d at 1246 (noting that courts should examine the conduct in context to determine whether it was severe or pervasive under the totality of the circumstances). The Eleventh Circuit has noted that the "severe or pervasive" requirement "is the element that tests the mettle of most sexual harassment claims." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). In determining the objective severity of the harassment, courts consider "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza*, 195 F.3d at 1246.

Before turning to the *Mendoza* factors, the Court must first address Plaintiff's claim that she and Officer Brockington were subjected to sixteen specific instances of harassment by Williams between August 15, 2021, and November 2, 2021. (Doc. 53 at 11). It is true that Plaintiff may state a claim for hostile work environment even when the words or conduct are not directed specifically at her so long as "the words and conduct [ ] are sufficiently gender-specific and either severe or pervasive[.]" *Reeves v. C.H. Robinson Worldwide, Inc.,* 594 F.3d 798, 811 (11th Cir. 2010) (citing *Ocheltree v. Scollon Prods., Inc.,* 335 F.3d 325, 331–32 (4th Cir. 2003)). However, Plaintiff must have at least been aware of other employees' experiences for those incidents to support her claim. *See Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1250 (11th Cir. 2014) ("The totality of a plaintiff's workplace circumstances does not include other employees' experiences of which the plaintiff is unaware."). But here, the evidence shows that Plaintiff was only aware of one incident involving Brockington, that is, the comment Williams made to Plaintiff and another officer that he had not "hit" Brockington yet. (Doc. 51-19 at 2). So, the remaining comments and conduct directed at Brockington, of which Plaintiff was unaware, cannot support her claim.

That leaves Williams's conduct directed at Plaintiff. Construed in the light most favorable to Plaintiff, the conduct she alleges in her sexual harassment claim include: (1) the Facebook messages "What's up?," "Morning," and "Hello," (Doc. 46-1 ¶¶ 23, 30, 34); (2) the photograph Williams took of Plaintiff on his phone and showed to another officer while

remarking that Plaintiff looked "bored," (*id.* ¶ 28); (3) grazing the back of Plaintiff's neck with his radio antenna, (*id.* ¶ 29); (4) the comments about Plaintiff switching off a light with her "big ass" and knowing what time she woke up because he saw her active status on Facebook, (*id.* ¶¶ 31–32); (5) grabbing Plaintiff's arm and commenting on her appearance, (*id.* ¶ 24); (6) the comment about conducting a "full body search" of Plaintiff, (*id.* ¶ 33); (7) watching Plaintiff enter the facility on August 27 and 28, 2021, (*id.* ¶ 41); and (8) answering two radio calls on October 14 and November 2, 2021. (*Id.* ¶¶ 45–46, 49).

1. *Severity of the Conduct*

The Court begins with the second factor, the severity of the conduct, and finds that the alleged statements and conduct do not rise to the level of severe or pervasive under Title VII. While Williams's conduct at times may have been inappropriate and offensive, it fails to meet the severity prong required to constitute actionable sexual harassment. First, the Facebook messages are best characterized as innocuous greetings that do not rise to the level of sexual harassment. *See Gupta*, 212 F.3d at 585 ("While frequently calling an employee at home and making even innocuous inquiries may be annoying or inappropriate behavior, it does not equal severe or pervasive sexual harassment[.]"). Second, Williams's comment that Plaintiff (or her haircut) looked "cute, very cute" likewise does not rise to the level of sexual harassment. As the Eleventh Circuit stated in *Gupta*,

> A man can compliment a woman's looks (or a woman compliment a man's looks) on one or several occasions by telling her that she is looking 'very beautiful,' or words to that effect, without fear of being found guilty of sexual harassment for having done so. Words complimenting appearance may merely state the obvious, or they may be hopelessly hyperbolic. Not uncommonly such words show a flirtatious purpose, but flirtation is not sexual harassment.

212 F.3d at 584. Third, the comments about conducting a "full body search," Plaintiff turning off a light switch with her "big ass," and the fact Williams hadn't yet "hit" Brockington are at worst "teasing" and "offhand comments" which are not severe enough to constitute severe sexual harassment, even if they may have been embarrassing to Plaintiff. *See Faragher*, 524 U.S. at 788 ("Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."); *DeVaughn v. City of Clanton, Ala.*, 992 F. Supp. 1318, 1324 (M.D. Ala. 1997) ("Comments which are merely embarrassing do not create a prima facie case of sexual harassment."). Fourth,

knowing what time Plaintiff woke up based on her Facebook activity and showing another officer a photograph of Plaintiff looking "bored," even if the photograph captured Plaintiff's rear end, do not amount to sexual harassment.

Simply put, the acts and comments Plaintiff complains of, even viewed together, are not the sort of conduct that the Eleventh Circuit has generally found to constitute "severe or pervasive" harassment. *Compare Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1248 (11th Cir. 2004) (conduct was sufficiently severe or pervasive where plaintiff's supervisor "repeated[ly] attempt[ed] to touch her breasts, place his hands down her pants, and pull off her pants[,]" and "enlist[ed] the assistance of others to hold her while he attempted to grope her"), *and Olson v. Lowe's Home Ctrs. Inc.*, 130 F. App'x 380, 388 (11th Cir. 2005) (conduct involving sexually explicit and vulgar comments, unwanted physical touching including kissing and forcible rubbing was sufficiently severe), *and Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) (coworker's conduct involving giving plaintiff unwanted massages, standing so close to plaintiff that his body parts touched her from behind, and pulling his pants tight to reveal the imprint of his private parts was sufficiently severe), *with Mendoza*, 195 F.3d at 1247–48 (holding that coworker's comment "I'm getting fired up," one occasion in which he rubbed his hip against plaintiff's hip while touching her shoulder and smiling, two instances in which he made a sniffing sound while looking at plaintiff's groin area and one instance of sniffing without looking at her groin, and "constant" following and staring at plaintiff in a "very obvious fashion" did not constitute severe harassment), *and Gupta*, 212 F.3d at 584–86 (holding that supervisor's flirtatious comments, frequent late-night phone calls to plaintiff's house, unbuckling his belt and pulling down his zipper to tuck in his shirt in plaintiff's presence, staring at plaintiff, touching plaintiff's hand and finger, asking plaintiff to lunch, and lifting plaintiff's dress about four inches, feeling the hem, and asking about the fabric did not constitute severe harassment).

2. *Physical Threats or Humiliation*

As to the third factor, whether the conduct is physically threatening or humiliating, Plaintiff does not present evidence that Williams's conduct was physically threatening or humiliating. The only instance of physical touch was Williams grabbing Plaintiff's arm in the hallway before telling her she looked "cute." Plaintiff testified that Williams grabbed her arm

to get her attention. (Doc. 49 at 47:24–25). But it is well-established that not every physical touching of one employee by a coworker constitutes actionable sexual harassment under Title VII. *See Tonkyro v. Sec'y, Dep't of Veterans Affs.*, 995 F.3d 828, 839 (11th Cir. 2021) (affirming summary judgment on sex-based hostile work environment claim where alleged conduct of female plaintiff's female co-worker, including pulling up her shirt, chest bumping, hugging and kissing her on the cheek, was insufficiently severe or pervasive); *see also Dar Dar v. Associated Outdoor Club, Inc.*, 248 F. App'x 82, 86 (11th Cir. 2007) (holding that two instances of employees touching plaintiff's buttocks did not establish a hostile work environment).

Plaintiff also claims that Williams was stalking her when he watched and stared at her as she walked into the facility on August 27 and 28. (Doc. 53 at 11). Williams was working an overtime shift on perimeter duty, which put him outside the facility on both days. (Doc. 50 at 128:10–13). But even assuming that Williams's staring "betray[ed] romantic or sexual attraction," which might be considered conduct of a sexual nature,[3] "the everyday observation of fellow employees in the workplace is [ ] a natural and unavoidable occurrence when people work together in close quarters or when a supervisor keeps an eye on employees." *Mendoza*, 195 F.3d at 1248 (holding that plaintiff's supervisor's "constant" following and staring did not create a jury issue on her sexual-harassment claim, where there was no allegation of any staring or following outside the workplace or of calling her after work, and plaintiff admitted that the supervisor never followed her in the part of the building where she worked and spent most of her time). Like the plaintiff in *Mendoza*, Plaintiff has presented no evidence that Williams stared at or stalked her inside the facility during her shift. In fact, the only times she physically saw Williams after her complaint and subsequent transfer to B shift were on the two days in August when Williams watched her walk inside for her shift while he was on perimeter duty. (Doc. 46-1 ¶ 43).

*3. Interference with Job Performance*

As to the fourth factor, interference with job performance, Plaintiff has not presented evidence that the cumulative effect of Williams's conduct unreasonably interfered with her job

[3] The Court makes this assumption because, as stated at the start of its analysis, the Court assumes, without deciding, that the alleged harassment was based on Plaintiff's gender, as is required to establish the third element of a prima facie case for a hostile work environment based on sexual harassment.

performance. The interference inquiry involves both a subjective and objective component. *Gupta*, 212 F.3d at 586 (citing *Mendoza*, 195 F.3d at 1246). It is true that Plaintiff was upset by the two instances of Williams answering her radio calls and asked for permission to leave work early as a result. So, Plaintiff meets the subjective prong. "But a plaintiff's subjective feelings and personal reactions are not the complete measure of whether conduct is of a nature that it interferes with job performance." *Id.* If that were so, "the most unreasonably hypersensitive employee would be entitled to more protection than a reasonable employee." *Id.* Based on the foregoing analysis, the Court concludes that the conduct and statements in this case would not have interfered with a reasonable employee's performance of her job.

The remaining factor—the frequency of the harassing conduct—is also for the most part lacking, but to the extent Plaintiff showed frequent conduct, the frequency of it does not compensate for the absence of the other factors.

In sum, Plaintiff failed to create a genuine issue of material fact on the fourth element of her hostile work environment claim. Under the relevant *Mendoza* factors, the alleged harassment was not sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment under the totality of the circumstances. As such, Plaintiff's claim fails, and LaSalle is entitled to summary judgment on Plaintiff's sexual harassment hostile work environment claim in Count I.[4]

**B. Retaliation Claim**

LaSalle moves for summary judgment on Plaintiff's retaliation claim in Count III, arguing that Plaintiff cannot establish a prima facie case of retaliation. (Doc. 46-2 at 19).

Title VII prohibits retaliation against an employee "because [s]he has opposed any practice made an unlawful employment practice by [Title VII], or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing [thereunder]." 42 U.S.C. § 2000e–3(a). Where, as here, there is no direct evidence of unlawful retaliation, the Court applies the burden shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1344–45

[4] Because the Court finds that Plaintiff's claim fails on the severe or pervasive element, the Court need not address the remaining element—a basis for LaSalle's liability—or LaSalle's alternative argument regarding the *Faragher-Ellerth* defense.

(11th Cir. 2022). The framework has three steps. *Id.* First, Plaintiff bears the initial burden of establishing a prima facie case of retaliation. She may do so by showing that: (1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected conduct. *Copeland v. Ga. Dep't of Corr.*, 97 F.4th 766, 782 (11th Cir. 2024). If Plaintiff makes out a prima facie case, the burden shifts to LaSalle "to articulate a legitimate, non-discriminatory reason or reasons for the retaliation." *Patterson*, 38 F.4th at 1345 (citing *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020)). If LaSalle makes such a showing, the burden shifts back to Plaintiff to "show that each reason is merely a pretext and that the real reason was retaliation." *Id.*

There is no dispute that Plaintiff satisfies the first element of her prima facie case: she engaged in protected activity by filing the August 22, 2021 sexual harassment complaint. *See Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1350 (11th Cir. 1999). Thus, the Court addresses the remaining elements.

1. *Adverse Employment Action*

Plaintiff must establish that she suffered a materially adverse employment action. "Adverse employment action does not refer only to ultimate employment decisions, such as the decision to discharge an employee." *Shannon v. Bellsouth Telecommunications, Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (citing *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998)). Instead, in the absence of an ultimate employment decision, a plaintiff can still show an action is materially adverse if it is "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006) [hereinafter *Burlington Northern*]; *see Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008). In applying this objective standard, the Court looks at the surrounding circumstances and context, keeping in mind that "[t]he anti-retaliation provision [of Title VII] protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Id.* at 67, 69 ("We phrase the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters."). Further, "[a]ctions that reasonably lead to consequences such as reduced pay, a smaller raise than the employee would otherwise receive, or suspension of incentives are generally considered materially adverse." *Davis v. Legal Servs. Ala., Inc.*, 472 F.

Supp. 3d 1123, 1134 (M.D. Ala. 2020), *aff'd*, 19 F.4th 1261 (11th Cir. 2021) (citing *Edwards v. Nat'l Vision, Inc.*, 568 F. App'x 854, 862 (11th Cir. 2014)).

Here, Plaintiff points to three instances of alleged retaliation that she claims constitute adverse employment actions: denial of overtime hours, threats of discipline, and her constructive discharge from ICDC. (Doc. 53 at 16–17). Although she doesn't make the argument explicitly, Plaintiff appears to also contend that LaSalle's decision to transfer her to B shift was an adverse action. (*Id.* at 17).

**a. Denial of Overtime**

As to the alleged denial of overtime, Plaintiff claims she was denied overtime in retaliation for her sexual harassment complaint. Plaintiff does not dispute Warden Paulk's testimony that most of the overtime work available in September and October of 2021 involved perimeter and transportation duties, or that she was unqualified to perform those duties. Plaintiff instead argues that there was "plenty of overtime in positions that did not require certifications[,]" for example, "F Rover," "Central Control," "Utility," and "Front Desk." (Doc. 53 at 6). Plaintiff bases her argument solely on the fact that she and other officers worked overtime assignments in those positions in August, which ignores the fact that ICDC's contract to house ICE detainees was terminated that month, resulting in a drastically reduced number of inmates, and in turn, a reduction in the number of employees needed to staff the facility. And more importantly, Plaintiff's argument is unsupported by any evidence that opportunities for overtime hours in those positions were actually available during the months of September and October. For example, Plaintiff does not present evidence that another officer with her same level of credentials worked overtime in those positions during September or October. Without such evidence, Plaintiff's argument that there were "plenty" of overtime opportunities for which she was qualified, is unsupported speculation insufficient to create a genuine dispute of fact. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (observing that, at the summary judgment stage, "speculation does not create a genuine issue of fact").

That leaves Plaintiff's contention that she could have worked up to twelve hours of overtime between her shift on B shift and Williams's D shift the following night. (Doc. 53 at 18); (Doc. 53-1 ¶ 50); (Doc. 53-3 ¶ 54). Plaintiff doesn't specify what positions or assignments

she claims she could have worked during those twelve hours. As far as the special assignments of "F Rover," "Central Control," "Utility," and "Front Desk" go, Plaintiff has not presented evidence that overtime in these positions was available in September or October of 2021 after ICDC's contract with ICE was terminated. And, as the Court discussed above, it is undisputed Plaintiff could not have worked the special overtime positions of perimeter or hospital transport because she was unqualified. The only potential overtime remaining is regular shift security work in her role as an officer. But even that possibility is foreclosed because Plaintiff presents no evidence or argument that ICDC permitted officers to work their regular twelve-hour shift and then stay on duty for the following regular shift. And there's likewise no evidence that officers were allowed to work overtime during the regular day or night shift immediately preceding their assigned shift. So, any argument that Plaintiff could have worked "up to twelve hours of overtime" between her shift ending and Williams's shift beginning, or vice versa, is merely speculation. And again, such unsupported speculation is insufficient to create a genuine dispute of fact.

In sum, Plaintiff has presented no evidence that there were any overtime opportunities available for which she was qualified. As such, the Court finds no genuine dispute of fact regarding whether Plaintiff was denied overtime in retaliation for her complaint.

**b. Threats of Discipline**

As to the alleged threats of discipline, Plaintiff claims that Warden Paulk threatened her with an investigation and the three "write-ups or statements" submitted by other staff members during the October 15, 2021 meeting. (Doc. 53 at 16–17). At first glance, this alleged adverse action presents a closer call. But the Court concludes that the alleged threat does not rise to the level of an adverse employment action that would dissuade a reasonable employee from making a charge of discrimination for two reasons.

First, Plaintiff suffered no injury or harm as a result of the threat. It is undisputed that Plaintiff never received any formal write-ups, warnings, demotions, or other disciplinary action during her employment at ICDC. (Doc. 46-1 ¶ 21). Whatever the outcome of the alleged write-ups and investigation, it is clear they had no impact on Plaintiff's employment. Plaintiff continued working at ICDC for nearly a month after the meeting with Warden Paulk in the same position as an officer and with the same pay, duties, and regular work hours until her

separation on November 10, 2021. (*Id.*) Even viewing the facts in the light most favorable to Plaintiff, a reasonable employee would not have been dissuaded from complaining about discrimination from a threat of discipline which did not result in any injury or harm to her employment. *See Burlington Northern*, 548 U.S. at 57 (indicating that an action must be "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination"); *see also Barnett v. Athens Reg'l Med. Ctr. Inc.*, 550 F. App'x 711, 715 (11th Cir. 2013) (affirming summary judgment on retaliation claim where alleged adverse actions (reprimands, negative performance evaluations, and denial of vacation requests) had "no effect on [plaintiff's] job status whatsoever[,]" and thus would not have "deterred a reasonable employee from making or supporting a charge of discrimination"); *Davy v. Star Packaging Corp.*, 517 F. App'x 874, 877 (11th Cir. 2013) (affirming summary judgment on Title VII retaliation claim where neither of the actions plaintiff complained of had "a materially adverse effect" on him because the terms of his employment were unchanged).

Second, Plaintiff continued filing complaints after Warden Paulk's alleged threat. Plaintiff submitted at least four new complaints after the October 15, 2021 meeting.[5] (*See* Docs. 49-8–49-11). One of these complaints was submitted on October 16 and details the meeting with Warden Paulk. (Doc. 49-8). Another was submitted on November 3, 2021, wherein Plaintiff complains about Williams being present during her shift on November 2, 2021. (Doc. 49-9). As such, the undisputed evidence shows that Plaintiff was not in fact dissuaded from making complaints, which undermines her position that LaSalle's actions would have dissuaded a reasonable employee from complaining. *See Burlington Northern*, 548 U.S. at 68. Significantly, other courts in this Circuit routinely find that a plaintiff who continues filing complaints after the alleged adverse action cannot establish that the alleged action "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *See, e.g., Daugherty-Davis v. Barr*, No. 4:17CV200, 2019 WL 12058644, at *12 (N.D. Fla. Sept. 3, 2019) (applying *Burlington Northern* standard to hostile work environment retaliation claim); *Lee*

---

[5] The Court notes that Plaintiff made, in total, six additional complaints after submitting her initial complaint on August 22, 2021. (*See* Docs. 49-6–49-11). The additional complaints were all submitted after Plaintiff claims she was subjected to adverse employment actions, for example, the first was submitted on September 2, 2021, after Plaintiff claims she was denied overtime, (*see* Doc. 49-6), and the final complaint was submitted after Plaintiff's employment ended on November 10, 2021. (*See* Doc. 49-11).

*v. City of Walthourville*, No. 4:18-CV-90, 2020 WL 907862, at *10 (S.D. Ga. Feb. 24, 2020) (applying *Burlington Northern* standard to Fair Labor Standards Act retaliation claim); *DeLaughter v. Verizon Commc'ns, Inc.*, No. 6:22-CV-2370, 2024 WL 4956730, at *20 (M.D. Fla. Dec. 3, 2024) (applying *Burlington Northern* standard to Florida Civil Rights Act retaliation claim).

Plaintiff cites *Mills v. Cellco Partnership*, where the district court noted that "threats of discipline qualify as precisely the type of employment action an employer might use to dissuade a reasonable worker from making or supporting a charge of discrimination." 376 F. Supp. 3d 1228, 1247 (N.D. Ala. 2019). While that may be true in some cases, the Court must view the alleged threat here in context because, as the Supreme Court stated in *Burlington Northern*, "[c]ontext matters[,]" and the "significance of any given act of retaliation will often depend upon the particular circumstances." 548 U.S. at 67–69. For the reasons discussed above, the Court finds that the alleged threat of discipline in this case would not have dissuaded a reasonable employee from making or supporting a charge of discrimination. Thus, considering the totality of the circumstances and accepting Plaintiff's version of events as true, the threat does not rise to the level of an adverse action.

**c. Constructive Discharge**

As to her alleged constructive discharge, Plaintiff claims that she had no choice but to resign due to LaSalle's "refusal to protect her from continued harassment by Williams, and because of LaSalle's retaliatory decision to deny her any overtime[.]" (Doc. 53 at 8). The Eleventh Circuit has "long recognized that constructive discharge can qualify as an adverse employment decision" for purposes of Title VII claims. *See e.g., Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1230 (11th Cir. 2001); *Davis v. Legal Servs. Ala., Inc.*, 19 F.4th 1261, 1265 (11th Cir. 2021). "Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." *Davis*, 19 F.4th at 1268 (citing *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009)). To prove a constructive discharge, "[a] plaintiff must show 'the work environment and conditions of employment were so unbearable that a reasonable person in [her] position would be compelled to resign.'" *Bryant*, 575 F.3d at 1298 (quoting *Virgo v. Riviera Beach Assoc., Ltd.*, 30 F.3d 1350, 1363 (11th Cir. 1994)). "The standard for proving constructive discharge is higher than the standard for proving a hostile work environment." *Hipp*, 252 F.3d at 1231. Further, this is an

objective standard that requires a plaintiff to show harassment that is more severe or pervasive than the minimum level required to establish a hostile working environment. *See id.*; *see also Virgo*, 30 F.3d at 1363. And it should be noted that "Title VII only requires that the employer take "reasonable steps" to end the harassment." *Anderson v. Surgery Ctr. of Cullman, Inc.*, No. 2:12-CV-00598, 2017 WL 6596611, at *8 (N.D. Ala. Mar. 31, 2017), *aff'd*, 839 F. App'x 364 (11th Cir. 2020) (citing *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1315 (11th Cir. 2001)).

Here, the Court has already determined that the evidence does not support Plaintiff's claim of a hostile work environment even under the more lenient standard. As discussed at length above, Plaintiff's version of events falls far short of satisfying the "severe or pervasive" standard necessary to establish a claim for a hostile work environment. Therefore, the undisputed facts, even when viewed most favorably to Plaintiff, do not support her assertion that she was constructively discharged.

In any event, Plaintiff's evidence does not support a reasonable inference that LaSalle deliberately made her working conditions so intolerable that any reasonable person in her position would be compelled to resign. Viewing the facts in the light most favorable to Plaintiff, LaSalle took reasonable steps to address Plaintiff's complaint by separating Plaintiff and her alleged harasser within the same week her complaint was made, initiating an investigation into her claims, and instructing Williams to stay away from Plaintiff. From the time of Plaintiff's initial complaint on August 22 until the date she submitted her letter of resignation on October 27, Williams was present at the facility during Plaintiff's shift only three times: August 27 and 28 when he watched her walk into the facility for her shift, and on October 14 he answered her radio call but was not otherwise in Plaintiff's presence. And as for the denial of overtime, the Court has already determined that Plaintiff presented no evidence there were overtime opportunities she was qualified to work. To put it plainly, the conditions Plaintiff faced, even based on her version of events, simply do not meet the high burden established by the Eleventh Circuit to demonstrate a constructive discharge. *See, e.g.*, *Poole v. Country Club of Columbus*, 129 F.3d 551, 553 (11th Cir. 1997) (reversing grant of summary judgment where plaintiff was "[s]tripped of all responsibility, given only a chair and no desk, and isolated from conversations with other workers").

**d. Shift Transfer**

As to her transfer to B shift, Plaintiff claims this was done to punish her for making the complaint against Williams. (Doc. 53 at 1, 17–18). Plaintiff testified that she was told her transfer from D shift was in response to her complaint, and she does not dispute Warden Paulk's testimony that it was standard procedure at ICDC to separate employees when a complaint had been made by one employee against another. (Doc. 49 at 72:4–7); (Doc. 51 at 63:8–16). Aside from being told she could no longer work overtime, it is undisputed that Plaintiff's work duties, pay, position, and hours remained the same following her transfer. (Doc. 46-1 ¶ 40); (*see* Doc. 53-1 ¶ 40). In fact, the only thing that changed with respect to Plaintiff's position was that she worked a different night shift with a different supervisor and coworkers. This type of lateral transfer, administered with the goal of separating Plaintiff from Williams, does not rise to the level of an adverse action.[6] A reasonable employee would not have been dissuaded from making or supporting a charge of discrimination by being moved away from her alleged harasser while an investigation into her claims was underway, especially when the move would not affect her pay, position, or duties. Indeed, a reasonable employee in Plaintiff's position experiencing sexual harassment from her supervisor would have likely welcomed removal from such a situation.

In sum, none of the alleged actions Plaintiff asserts, either individually or taken together, rise to the level of materially adverse employment actions that would have dissuaded a reasonable employee from making or supporting a charge of discrimination. Accordingly, Plaintiff has not presented sufficient evidence showing a genuine issue for trial as to whether she suffered an adverse employment action. Therefore, she failed to state a prima facie case at the first step of the *McDonnell Douglas* framework. As such, the Court need not address the remaining element of her retaliation claim or the remaining steps of the *McDonnell Douglas* analysis. *Jackson v. Blue Bird Corp.*, 792 F. App'x 706, 712 (11th Cir. 2019) ("Because we find

---

[6] The Court notes that, prior to the new standard for adverse employment actions articulated in *Burlington Northern*, courts in this District and throughout the Eleventh Circuit routinely held that a lateral transfer such as this, which did not involve a change in pay, job duties, or prestige, did not rise to the level of an adverse employment action. *See, e.g., Davis v. City of Loganville, Ga.*, No. 3:04-CV-068, 2006 WL 8445881, at *10 (M.D. Ga. Mar. 28, 2006) (finding that, in retaliation case decided before *Burlington Northern*, plaintiff's lateral transfer to a different location did not rise to the level of an adverse employment action where the transfer did not affect his pay, duties, or job prestige); *Burnette v. Northside Hosp.*, 342 F. Supp. 2d 1128, 1136–38 (N.D. Ga. 2004) (same and collecting cases).

that Jackson has not established a prima facie case of discrimination, we need not apply *McDonnell Douglas*'s presumption of discrimination in his favor.").

### C. Convincing Mosaic

The Court must, however, evaluate whether Plaintiff has shown a convincing mosaic of circumstantial evidence sufficient to sustain her claim for retaliation because, even though she cannot establish a prima facie case, "she does not automatically lose on summary judgment." *Ismael v. Roundtree*, 161 F.4th 752, 764 (11th Cir. 2025). In *Ismael*, the Eleventh Circuit provided guidance on the proper review on summary judgment when, as here, a plaintiff fails to establish a prima facie case of discrimination or retaliation, and thus, fails to satisfy the *McDonnell Douglas* test. *Id.* at 764–65. In such cases, plaintiffs do not lose by default, but rather, "the consequence is that the plaintiff must produce enough evidence, on her own and without any helpful evidentiary burdens or presumptions, to demonstrate a material issue of triable fact." *Id.* at 765. Therefore, "district courts should advance directly to the convincing mosaic inquiry." *Id.* So, although Plaintiff doesn't rely on a convincing mosaic theory to defeat Defendants' Motion, the Court addresses whether she has shown one, nonetheless.

As mentioned previously, Plaintiff relies on circumstantial evidence in support of her claims. With regard to claims without direct evidence,

> [T]he Eleventh Circuit has identified three nonexclusive categories of circumstantial evidence that can raise a reasonable inference of unlawful conduct: (1) evidence of suspicious timing, ambiguous statements, or other information from which unlawful intent may be inferred; (2) evidence of systematically better treatment of similarly situated employees; or (3) evidence that the employer's justification for its action is pretextual.

*Decoste v. City of Boynton Beach*, 818 F. Supp. 3d 1360, 1385–86 (S.D. Fla. 2026), *appeal dismissed*, No. 26-10632, 2026 WL 1907401 (11th Cir. July 2, 2026) (citing *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022)) (citation modified). Regardless of the form the evidence takes, "so long as [it] raises a reasonable inference" that the employer retaliated against the employee, "summary judgment is improper." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). Even under a convincing mosaic theory, "a plaintiff must still demonstrate that retaliation was the but-for cause of the employment action[,]" because "[u]ltimately, retaliatory intent is the crux of the matter[.]" *Decoste*, 818 F. Supp. 3d at 1386 (quoting *Curet v. Ulta Salon, Cosms. & Fragrance, Inc.*, No. 8:21-CV-1801, 2022 WL 4464751, at *12 (M.D. Fla. Sept. 26,

2022)); *see Bailey v. Metro Ambulance Servs., Inc.*, 992 F.3d 1265, 1274 (11th Cir. 2021) ("And in line with his retaliation argument, Bailey (mistakenly) contended that the 'but for' standard is not a precondition under the convincing mosaic model.").

Although Plaintiff doesn't make a convincing mosaic argument directly, she does contend that LaSalle's purported reasons for denying her overtime and transferring her to B shift were pretextual. (Doc. 53 at 18). "To show pretext, an employee must demonstrate 'such weaknesses, implausibilities, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Jackson*, 792 F. App'x at 713 (quoting *McCann v. Tillman*, 526 F.3d 1370, 1375 (11th Cir. 2008)).

Plaintiff claims the asserted reasons she was denied overtime—she was unqualified and to prevent overlap with Williams's shift—were pretextual because there were "plenty" of overtime positions for which she was qualified and there were twelve hours between B shift and D shift within which she could have worked overtime. (Doc. 53 at 18). As discussed above, however, neither of these arguments are supported by the evidence in the Record. Plaintiff's argument that there were "plenty" of overtime opportunities is unsupported speculation because Plaintiff presented no evidence that the positions she was qualified for were available in September or October of 2021, or that any officer with her same credentials actually worked such positions as overtime hours during the months after ICDC's ICE contract was terminated in August of 2021. And her argument that she could have worked up to twelve hours of overtime after her shift ended and before Williams's shift began the following night is likewise unsupported for the reasons discussed above. Thus, Plaintiff fails to rebut LaSalle's explanation and demonstrate that the reasons given for LaSalle's actions were pretext for retaliation.

Next, Plaintiff argues that the proffered reason for her transfer—to separate her from Williams—was pretextual because LaSalle did not prevent Williams from also working B shift. (Doc. 53 at 18). It is undisputed that Williams was present at ICDC during four of Plaintiff's shifts after her transfer. (Doc. 46-1 ¶ 52). On August 27 and 28, 2021, Williams was assigned overtime shifts guarding the facility's perimeter, on October 14, 2021, Williams was called to conduct a hospital transport, and on November 2, 2021, Williams was called in to work

another hospital run. (*Id.* ¶¶ 46, 49); (Doc. 50 at 128:10–13, 131–132). Significantly, during these isolated events, Williams was called in for assignments that did not require him to be in the vicinity of Plaintiff's post inside the building, and indeed, he was never in Plaintiff's physical presence on any of these dates. Thus, the mere fact that Williams was at the facility during Plaintiff's shift does not "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [LaSalle's] proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence[.]" *Jackson*, 792 F. App'x at 713.

In sum, Plaintiff's arguments do not rebut, head-on, the legitimate and non-retaliatory reasons proffered by LaSalle. Further, the facts and Record evidence do not lead to the reasonable inference that LaSalle was motivated by retaliatory intent and are not sufficient to "present a convincing mosaic of circumstantial evidence that would allow a jury to infer" that LaSalle transferred or denied Plaintiff overtime in retaliation for her sexual harassment complaint against Williams. Again, retaliatory intent—not speculation or isolated events—remains the dispositive inquiry. Any mosaic Plaintiff might attempt to create collapses under scrutiny. Therefore, because Plaintiff has failed to establish a prima facie case of retaliation or a convincing mosaic that raises a reasonable inference of unlawful retaliation, her retaliation claims cannot survive summary judgment. Accordingly, LaSalle is entitled to summary judgment on Plaintiff's retaliation claim in Count III.

### D. State Law Claims

Lastly, Defendants move for summary judgment on Plaintiff's state law claims at Counts IV and VI. Because the Court declines to exercise supplemental jurisdiction over those claims, it doesn't reach their merits.

District courts have original jurisdiction over claims arising under federal law. 28 U.S.C. § 1331. So the Court has original jurisdiction over Plaintiff's federal claims. Over state law claims, the Court may exercise supplemental jurisdiction if those claims are "so related" to the original jurisdiction claims "that they form part of the same case or controversy[.]" 28 U.S.C. § 1367(a). The Court, however, may decline to exercise supplemental jurisdiction if it has dismissed all original-jurisdiction claims. 28 U.S.C. § 1367(c)(3). If so, the Court considers "judicial economy, convenience, fairness, and comity" to determine if it should exercise

supplemental jurisdiction. *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1288 (11th Cir. 2002). Allowing state courts to resolve state law claims serves both comity and judicial economy. *Id.* This principle carries particular force when federal law claims have been dismissed prior to trial. *Id.*

The Court has granted summary judgment on Plaintiff's Title VII claims—its source of original jurisdiction. Considering judicial economy, fairness, and comity, the Court declines supplemental jurisdiction over the state law claims. Therefore, those claims are dismissed without prejudice. Because the Court does not reach the state law claims' merits, Defendants' Motion for Summary Judgment as to those claims is denied, as moot.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 46) is **GRANTED**, in part, and **DENIED**, in part. The Motion is granted with respect to Plaintiff's hostile work environment harassment claim at Count I and retaliation claim at Count III. The Motion is also granted as to Plaintiff's Title VII discrimination based on sex claim at Count II and her state law claim for intentional infliction of emotional distress at Count V because, as noted previously, Plaintiff waived those claims in response to Defendants' Motion.

The Motion is denied, as moot, as to Plaintiff's state law claims for assault at Count IV and negligent retention and supervision at Count VI. Those claims are therefore **DISMISSED**, without prejudice, because the Court declines to exercise supplemental jurisdiction over them.

**SO ORDERED**, this 30th day of July 2026.

**/s/ W. Louis Sands**
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**